# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1881V**

|  |  |
|---|---|
| FEI CAI,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Special Master Horner<br><br>Filed: September 23, 2025<br><br>Reissued for Public Availability:<br>June 2, 2026 |

*Fei Cai, Xuzhai Village, ZheJiang Province, China, pro se petitioner.*
*James Vincent Lopez, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION DISMISSING PETITION[1]

On November 14, 2024, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging she suffered a significant aggravation of contusive chest pain, resulting in chronic chest pain and other symptoms, as a result of a Tetanus diphtheria and acellular pertussis ("Tdap") vaccination of January 28, 2022.  (ECF No. 1, pp. 1, 6.)  For the reasons discussed below, this case is now **DISMISSED**.

### I.    Procedural History

The petition was accompanied by documents, mostly medical records, marked as Exhibits 1-36.  Further medical records were filed in December of 2024, marked as Exhibit 37.  Petitioner filed a statement of completion on December 27, 2024.

On March 10, 2025, respondent filed his Rule 4(c) Report, contending that compensation is not appropriate because petitioner failed to demonstrate a defined and recognizable injury.  (ECF No. 15, p. 9 (citing *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011)).)  In his report, respondent explained that petitioner's left-sided chest pain was the result of an altercation that had occurred five

---

[1] Pursuant to Vaccine Rule 18(b), this Decision was initially filed on September 23, 2025, and the parties were afforded 14 days to propose redactions.  The parties did not propose any redactions.  Accordingly, this Decision is reissued in its original form for posting on the court's website.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

days prior to her vaccination with no indication the pain worsened after the vaccination. (*Id.* at 8.)  He argued that "there is not a single statement in petitioner's medical records from her providers to suggest her left-sided chest pain was caused by a vaccine, or that she ever had an adverse vaccine reaction."  (*Id.*)

Shortly thereafter, I issued an order to show cause why this case should not be dismissed.  (ECF No. 16.)  After a review of petitioner's burden of proof and her medical records, I advised that "petitioner's medical records do not preponderately demonstrate a cognizable injury that could have been caused, or aggravated, by her Tdap vaccination."  (*Id.* at 6-7.)  Additionally, I noted that

> [T]he Vaccine Act itself forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  42 U.S.C. § 300aa-13(a)(1).  Petitioner's medical records do not include any medical opinion sufficient to support vaccine causation or significant aggravation of petitioner's condition.

(*Id.* at 7.)  Accordingly, I instructed petitioner that "introduction of additional medical records or factual allegations will not substitute for the submission of a medical opinion where such an opinion remains necessary to establish a cognizable injury as well as a sound and reliable medical theory linking vaccination and injury."  (*Id.*)

Initially, I permitted petitioner 90 days, until June 11, 2025, to respond to the show cause order by either filing a medical opinion supporting her claim or a brief explaining why she should nonetheless be found entitled to compensation.  (ECF No. 16, p. 7.)  However, I cautioned that "my assessment is that legal briefing alone is unlikely to be sufficient to avoid dismissal given the current state of the record evidence . . . ."  (*Id.* at 7-8.)  Petitioner subsequently filed two motions for extension of time, both of which were granted.  Ultimately, petitioner's show cause deadline was August 11, 2025, allowing her a total of five months to respond to the show cause order.

On August 11, 2025, petitioner filed her show cause response.  She filed a 57-page brief, numerous medical articles, and some additional evidence.[3]  (ECF Nos. 22-23.)

Thereafter, petitioner filed two motions, seeking an award of costs associated with the litigation of her claim.  (ECF Nos. 24-25.)  On September 3, 2025, respondent filed a response to petitioner's motions, arguing that petitioner "is not entitled to an

---

[3] In her show cause response, petitioner states that "I have not yet completed PART I, so I will leave some of the content blank.  Perhaps I will respond in a future statement, or perhaps I will leave it as is." (ECF No. 22, p. 1.)  Additionally, petitioner stated that she "forgot" to file medical records for some of her medical encounters.  (*Id.* at 1-2.)  Petitioner's filing does not actually request additional time to comply with the show cause order and, in any event, nothing in petitioner's filing is sufficient to demonstrate good cause for any extension of time.  Nor has petitioner filed any separate motion for extension of her deadline.

award of interim costs." (ECF No. 26, p. 10.)  Thereafter, petitioner filed a reply to respondent's response.  (ECF No. 27.)  These motions will be addressed by a separate decision.

## II.      Factual History

In her petition, petitioner claims that she did not experience any chest pain prior to January 23, 2022.  (ECF No. 1, p. 1.)  She avers that, in 2019, she was diagnosed as being on the schizophrenic spectrum, although she disputes this diagnosis.[4]  (Ex. 36, p. 2.)  On June 11, 2019, petitioner was hospitalized for altered mental state and diagnosed with depression and psychosis following a psychiatry evaluation.  (Ex. 4, pp. 3, 7.)  She reported a history of depression and psychological issues, as well as prior mental health treatment.  (*Id.* at 3, 9.)  She was subsequently transferred to an inpatient psychiatric facility, where she received treatment until she was discharged in stable condition on June 24, 2019.  (*Id.* at 14-15; Ex. 5.)  Her discharge diagnosis was "unspecified schizophrenic spectrum."  (Ex. 5, p. 1.)

On January 28, 2022, petitioner presented to a primary care provider, complaining of left-sided chest pain.  (Ex. 3, p. 1.)  She reported that she was involved in a fight, during which she was kicked in the stomach and left breast, on January 23, 2022.  (*Id.*)  A physical examination revealed tenderness to palpation in her left rib after blunt force trauma to the chest, but no hematoma or swelling.  (*Id.* at 4.)  She was diagnosed with a left rib contusion.  (*Id.*)  Petitioner was also noted to be due for a Tdap vaccination.  (*Id.* at 5.)  An immunization summary report shows that petitioner received the Tdap vaccination in her left deltoid that same day.  (Ex. 2, pp. 2-3.)  Petitioner was given acetaminophen for her pain.  (Ex. 10, p. 4.)

Petitioner had a telehealth appointment with her primary care provider on February 3, 2022, with complaints of left-sided rib pain.  (Ex. 10, pp. 1, 5.)  She again associated her symptoms with a physical altercation, during which she was punched in the left side of the chest.  (*Id.* at 1.)  She reported bruising over her left breast and swelling.  (*Id.*)  Her pain was aggravated by deep breathing, and she was concerned that a rib on her left side was fractured.  (*Id.*)  Notably, while a review of symptoms was positive for left rib pain, it was negative for chest pain.  (*Id.* at 4.)  Petitioner was assessed with rib pain on the left side associated with a history of recent trauma, for which she was referred for an x-ray of the chest and rib on the left side.  (*Id.* at 5-6.)  She was also assessed with auditory and visual hallucinations associated with schizophrenia, but she refused a psychiatry referral.  (*Id.* at 7.)

---

[4] In her show cause response, petitioner clarifies that she does not dispute that she was diagnosed with schizophrenia, she only disputes that the diagnosis is correct.  (ECF No. 22, p. 2.)  She indicates that her physicians only diagnosed schizophrenia because they cannot see the unhuman creature that controls her.  (*Id.*)

That same day, petitioner presented to the emergency department with complaints of left rib pain "after being assaulted." (Ex. 14, pp. 15-18.) She denied shortness of breath, bruising, swelling, numbness, tingling, or weakness, and she reported that she had treated with acetaminophen (Tylenol). (*Id.* at 16-17.) A subsequent x-ray was unrevealing. (*Id.* at 18.) Petitioner was discharged in stable condition with a discharge diagnosis of rib contusion. (*Id.*) She was advised to treat with rest and ice. (*Id.*) She returned to the emergency department a week later, on February 10, 2022, complaining of a sore throat. (*Id.* at 4-5.) It is noted that petitioner was "perseverating on how her bruised rib is connected to her throat." (*Id.* at 4.) She was treated with acetaminophen and discharged with a diagnosis of pharyngitis. (*Id.* at 4-6.)

Petitioner had a telehealth appointment with her primary care provider on March 1, 2022. (Ex. 25, p. 47.) She reported that she "cannot feel her left kidney so she feels that her left kidney is not working well." (*Id.*) There is no mention of chest pain during this encounter. A subsequent ultrasound of her abdominal back wall showed no evidence of acute abnormality involving the bilateral kidneys. (*Id.* at 53.) Petitioner had another telehealth appointment with her primary care provider on March 17, 2022, during which she complained of "some pain in her lungs/chest area." (*Id.* at 41.) An electrocardiogram and additional chest x-ray were ordered. (*Id.* at 45.) Petitioner also complained of dizziness and weakness, which she associated with a possible cerebral hemorrhage, and a CT scan of her head and brain was ordered. (*Id.* at 41, 45.) Petitioner was advised to go to the emergency room for further evaluation of her symptoms. (*Id.* at 45.)

Petitioner continued to seek treatment for various issues, including headaches and dizziness (May 2022 emergency department encounter at Ex. 15, p. 55); upper respiratory infection (October 2022 emergency department encounter at Ex. 16, pp. 4-6); concern for possible rabies (March 2023 primary care encounter at Ex. 25, pp. 18-24); and concern for parasite infection (March 2023 primary care encounter at Ex. 25, pp. 25-30). There is no mention of chest pain during these encounters.

On June 14, 2023, petitioner presented to the emergency department with concerns of a possible pulmonary embolism. (Ex. 18, p. 4.) It was noted that, "[o]n June 13th around 6:15 p.m., patient was sitting in her car and had sudden onset of chest pain that was sharp and substernal. 6/10. Chest pain was nonradiating and associated with shortness of breath and lightheadedness. This lasted for 10 minutes. . . . No recurrent pain since." (*Id.*) Petitioner was diagnosed with atypical chest pain and advised to follow up with her primary care provider. (*Id.* at 10.) On June 16, 2023, petitioner presented to her primary care provider and reported persistent left breast pain that radiated to her back. (Ex. 25, p. 12.) She also reported concern that a blood clot was "flowing around in her body" and causing thigh pain. (*Id.*) Petitioner was

4

diagnosed with health anxiety after expressing that she did not trust her provider and refusing to be examined.  (*Id.* at 16.)

On August 23, 2023, petitioner presented to a new primary care provider with concerns for a blood clot.  (Ex. 20, p. 21.)  When asked why she was suspicious of a blood clot, petitioner responded that "she feels some sensation of pain in her left chest area and she believes it is due to the clot."  (*Id.*)  She reported taking supplements for "inflammation" in her abdomen and lungs.  (*Id.*)  Although a review of symptoms was positive for anxiety, she denied that her anxiety was the source of her symptoms.  (*Id.*)  On September 9, 2023, petitioner presented to the emergency department for a panic/anxiety attack.  (Ex. 21, pp. 6-9.)  There was no chest pain noted on physical examination, and petitioner was discharged in a stable condition.  (*Id.* at 8-12.)  Petitioner returned to the emergency department on September 14, 2023, with concern for a possible snake bite.  (Ex. 22, pp. 4, 7.)  Notably, petitioner reported anxiety and denied chest pain and shortness of breath.  (*Id.* at 4.)  An October 13, 2023 MRI of the chest wall without contrast showed multiple T2 hyperintense lesions within the liver that were believed to represent cysts, although it was noted that some were too small to be characterized.  (Ex. 23.)[5]  The clinical indication was unspecified anxiety disorder.  (*Id.*)

On October 19, 2023, petitioner presented to the emergency department for chest pain.  (Ex. 24, p. 5.)  She reported a history of "chest pressure for a year," which was reportedly aggravated "after she was bit by a poisonous snake a month ago."  (*Id.*)  She reported intermittent palpitations and suspected that the cysts in her liver "may be pressing on her heart [and] causing her symptoms."  (*Id.*)  Her request for an MRI of her chest was denied, and petitioner left the emergency department without further work-up.  (*Id.* at 6.)

Petitioner then presented to another emergency department the following day with a reported history of chest pain since January 2022.  (Ex. 28, p. 4.)  She explained that the "pain began after she was involved in an altercation where she had [an] injury to her [left] chest and was given a tdap [vaccine]."  (*Id.*)  She suggested that the Tdap vaccination "triggered her chest pain."  (*Id.*)  It was noted that petitioner had previously presented for multiple emergency department visits, complaining of chest pain, shortness of breath, and palpitations, and that she was discharged after negative work-up.  (*Id.*)  A physical examination was unremarkable, and petitioner was discharged after refusing further work-up.  (*Id.* at 4-5.)

On November 1, 2023, petitioner had a telehealth appointment, during which she reported a one-year history of intermittent chest pain that "started after getting the tdap vaccine."  (Ex. 20, p. 7.)  She described how her symptoms worsened after being "bitten by a poisonous snake."  (*Id.*)  She also reported some shortness of breath.  (*Id.*)  It was

---

[5] This exhibit is docketed as Exhibit 23 but incorrectly marked as Exhibit 26.  (ECF No. 1-26.)  For the sake of clarity, this exhibit will be referred to as Exhibit 23.

noted that she had been seen in the emergency department several times, including the day prior on October 31, 2023, for the same issue. (*Id.* at 7-8.) Petitioner's chest pain and shortness of breath were believed to be "non-cardiac related," and she was referred to a pulmonologist for a second opinion. (*Id.* at 9.) A November 11, 2023 CT scan of petitioner's chest showed no acute findings. (Ex. 27, pp. 6-7.)

On March 5, 2024, petitioner presented to the emergency department with reports of a two-year history of "dizziness since receiving a vaccine injection . . . occasionally accompanied by headaches and chest pain." (Ex. 32, p. 2.) She claimed that her symptoms worsened after she was "bitten by a 'venomous snake.'" (*Id.*) A subsequent ultrasound of the liver, gallbladder, pancreas, spleen, and kidneys showed multiple liver cysts, and a pulmonary CT scan showed mild foci of fibrous proliferation in both lungs and a slightly hypodense foci in the liver. (*Id.* at 4, 9.)

### III.    Show Cause Response

In her show cause response, petitioner argues that on January 23, 2022, she suffered a left chest contusion, which she reasons included a high probability of a local alveolar rupture in the left lung, as well as lacerations of the pleura and endothelial damage to thoracic blood vessels. All of this resulted in "traumatic inflammation," which was the reason for her January 28, 2022 medical encounter at which she received the Tdap vaccine at issue. (ECF No. 22, p. 30.) She contends that the Tdap vaccine was a "second hit" that resulted in a cytokine storm that activated immune cells throughout her body. (*Id.* at 31.) She indicates that "[t]hat is why I felt serious chest pain in the night of 1/28/2022, hard breath, can not breath well when lay down, but have to sit up, use mouth to breath, maybe numbness in limb. That was cytokine storm." (*Id.* (citation omitted).) She cites a search history filed as Exhibit 13, which shows that on January 28, 2022, she searched for "tetanus vaccine, side effects." (*Id.*; Ex. 13, p. 9.)

However, petitioner acknowledges that her medical records do not reflect a cytokine storm. She states: "At the time, no tests were done. You may not believe me. In fact, I think even if I went to ER that night, the problem would not be detected." (ECF No. 22, p. 32.) She continues: "I have never been evaluated [for] cytokine[s] in US during the cytokine storm, or shortly thereafter, and no doctor has ever given [an] assessment of the inflammation in my left chest, in my whole body. I don't have the cytokine test data from that time." (*Id.* at 33.) Nonetheless, petitioner represents that she underwent cytokine testing in 2025. (*Id.* at 35-36 (citing Ex. 57, pp. 16, 26, 33, 64).) Specifically, petitioner represents that she underwent testing for eight different cytokines on July 8, 2025; July 14, 2025; July 24, 2025; and August 5, 2025. (*Id.*) Of all of those results, a single measurement of IL-6 from July 8, 2025, was elevated above the reference range. (*Id.*)

Petitioner argues that

[t]he cytokine storm itself lasted for a period of time, followed by an immune-activated, chronic inflammatory period.  At present, in my body, at least in some damaged organ areas, there is low-threshold chronic inflammation, which will flare up under certain stimulation . . . [t]he cytokine and followed choronic [sic] inflammation stimulate nerve, caused neuroinflammation.  Right now, I have low-threshold neuroinflammation, and neurosensitization.

(ECF No. 22, p. 38.)

Petitioner indicates:

My understanding of my health problem is gradual.  On 10/2023, I realized that the left chest pain was related to the TDAP on 1/28/2022, but I did not link all the problems that occurred.  Even on 11/2024, while I filed this case, I just thought that the vaccine injury aggravated the left chest pain problem, causes contusive chest pain to become chronic, the chronic chest pain maybe cause the worsen problems.  But I didn't have a clear understanding of the specific principles of the symptoms at that time.  From about 4/2025, I started to use Deepseek to analyze my health problem, then Chat Gpt.  I wrote down my problems and placed them in Chat Gpt and Deepseek for analysis.  The results contain some incorrect info, but they provid[e] me good idea.  Meantime, I also analyze and search online.  I went to hospital to do several tests and imaging, which verify the analysis and find the health problems.  In this period, I went to doctor mainly for the test and imaging order, rarely listen to doctor.  Now I have clearly realized that the persistent pain in the left chest is composed by multiple factors, and the damage caused by the vaccine injury is far more than the aggravation of the left chest symptom.  It is a long-term chronic inflammation and multi-organ damage, including the lungs, heart, nerves, kidneys, blood vessels, liver, breast, pleura, cerebral blood flow, etc.

(ECF No. 22, p. 39.)

In her response, petitioner devotes much attention to analyzing her medical records, seeking both to rebut specific observations in respondent's report and the order to show cause and to connect various symptoms and findings into a broader presentation consistent with her theory of cytokine storm and chronic inflammation. (ECF No. 22, *passim*.)  However, she also acknowledges that her view is not supported by her medical records.  Under a heading titled "Why my real health problem never been revealed by doctor?," she argues that, despite seeking care "several times," "[i]f doc[to]r gave the wrong order of test or imaging, the problem can never be found."  (*Id*. at 50.)  She also explains that she cannot secure an expert opinion to support her claim. (*Id*. at 25-26.)  She stresses that "[i]n this situation, I had no expert testimony.  I cited a

7

large number of research papers to verify these medical theories.  I did lots of tests and imaging to discover my real health problems."  (*Id.* at 52.)

Petitioner argues that she has demonstrated how her claim meets the *Althen* and *Loving* tests (ECF No. 22, pp. 52-53) and contends that her case should not be dismissed (*Id*. at 56.)

Petitioner filed the following medical articles, cited throughout her show cause response, which I have also reviewed:

- Erhan Ayan et al., *The Role of Thoracic Trauma in Inflammatory Responses, Apoptosis and Bacterial Translocation Following Multiple Traumas*, 19 ULUS TRAVMA VE ACIL CERRAHI DERGISI 491 (2013) (Ex. 38)
- Mario Perl et al., *The Pulmonary and Hepatic Immune Microenvironment and Its Contribution to the Early Systemic Inflammation Following Blunt Chest Trauma*, 34 CRITICAL CARE MED. 1152 (2006) (Ex. 39)
- Makhabbat Bekbossynova et al., *Biochemical Markers of Myocardial Contusion After Blunt Chest Trauma*, 51 EUR. J. TRAUMA & EMERGENCY SURGERY 189 (2025) (Ex. 40)
- Chonthicha Tanking et al., *Acute Inflammatory Pericarditis and Constriction Following Blunt Chest Trauma*, 48 TURK KARDIYOLOJI DERNEGI ARSIVI 786 (2020) (Ex. 41)
- JJ Hoth et al., *Pulmonary Contusions Primes Systemic Innate Immunity Responses*, 67 J. TRAUMA 14 (2009) (Ex. 42)
- Rui Li et al., *Traumatic Inflammatory Response: Pathophysiological Role and Clinical Value of Cytokines*, 50 EUR. J. TRAUMA & EMERGENCY SURGERY 1313 (2024) (Ex. 43)
- Arun B. Arunachalam, *Vaccine Induce Homeostatic Immunity, Generating Several Secondary Benefits*, VACCINES, Apr. 2024, at 1 (Ex. 44)
- Joshua Gillard et al., *Antiviral Responses Induced by Tdap-IPV Vaccination Are Associated with Persistent Humoral Immunity to* Bordetella pertussis, NATURE COMMUNICATIONS, Mar. 2024, at 1 (Ex. 45)
- Esmaeil Farshi, *Cytokine Storm Response to COVID-19 Vaccinations*, 5 J. CYTOKINE BIOLOGY 34 (2020) (Ex. 46)
- Saskia van der Lee et al., *Robust Humoral and Cellular Immune Responses to Pertussis in Adults After a First Acellular Booster Vaccination*, FRONTIERS IMMUNOLOGY, Apr. 2018, at 1 (Ex. 47)
- Yasuyo Kashiwagi et al., *Production of Inflammatory Cytokines in Response to Diphtheria-Pertussis-Tetanus (DPT),* Haemophilus Influenzae *Type B (Hib), and 7-Valent Pneumococcal (PCV7) Vaccine*, 10 HUM. VACCINES & IMMUNOTHERAPEUTICS 677 (2014) (Ex. 48)
- Dominik Jarczak & Axel Nierhaus, *Cytokine Storm—Definition, Causes, and Implications*, INT'L J. MOLECULAR SCIS., Oct. 2022, at 1 (Ex. 49)

- Rami A. Namas et al., *Insight into the Role of Chemokines, Damage-Associated Molecular Patterns, and Lymphocyte-Derived Mediators from Computational Models of Trauma-Induced Inflammation*, 23 ANTIOXIDANTS & REDOX SIGNALING 1370 (2015) (Ex. 50)
- Jun-Ming Zhang & Jianxiong An, *Cytokines, Inflammation and Pain*, 45 INT'L ANESTHESIOLOGY CLINICS 27 (2007) (Ex. 51)
- Or Hen et al., *Dysautonomia Following Tetanus, Diphtheria, and Pertussis Vaccines (Tdap): The First Case of Extreme Cachexia Caused by Autoimmune/Inflammatory Syndrome Induced by Adjuvants (ASIA Syndrome) in a Human*, MEDICINA, Dec. 2021, at 1 (Ex. 52)
- Kazuhiro Murata et al., *Four Cases of Cytokine Storm After COVID-19 Vaccination: Case Report*, FRONTIERS IMMUNOLOGY, Aug. 2022, at 1 (Ex. 53)
- Axel Stachon et al., *Nucleated Red Blood Cells in the Blood of Medical Intensive Care Patients Indicated Increased Mortality Risk: A Prospective Cohort Study*, CRITICAL CARE, June 2007, at 1 (Ex. 54)
- Toshio Tanaka et al., *IL-6 in Inflammation, Immunity, and Disease*, COLD SPRING HARBOR PERSPS. BIOLOGY, Sept. 2014, at 1 (Ex. 55)
- Jeffrey R. Jackson et al., *The Codependence of Angiogenesis and Chronic Inflammation*, 11 FASEB J. 457 (1997) (Ex. 56)
- Michele Gaeta et al., *Expiratory CT Scan in Patients with Normal Inspiratory CT Scan: A Finding of Obliterative Bronchiolitis and Other Causes of Bronchiolar Obstruction*, MULTIDISC. RESPIRATORY MED., July 2013, at 1 (Ex. 59)
- Michiel L. A. Wieërs et al., *Potassium and the Kidney: A Reciprocal Relationship with Clinical Relevance*, 37 PEDIATRIC NEPHROLOGY 2245 (2022) (Ex. 60)
- David C. Fajgenbaum & Carl H. June, *Cytokine Storm*, 383 N. ENG. J. MED. 2255 (2020) (Ex. 61)
- Shanshan Luo et al., *Chronic Inflammation: A Common Promoter in Tertiary Lymphoid Organ Neogenesis*, FRONTIER IMMUNOLOGY, Dec. 2019, at 1 (Ex. 62)
- Yafeng Wang et al., *Microglia in Radiation-Induced Brain Injury: Cellular and Molecular Mechanisms and Therapeutic Potential*, CNS NEUROSCI. & THERAPEUTICS, May 2024, at 1 (Ex. 64)
- Ahmed F. Ramzee et al., *Traumatic Lung Laceration Secondary to Avulsed Lung Adhesion – A Case Report*, TRAUMA CASE REPS., June 2023, at 1 (Ex. 65)

## IV.    Legal Standard

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal

9

link between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination, which is also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A)-(B); § 300aa-11(c)(1)(A)-(C); § 300aa-14(a).

Otherwise, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *see also Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).

In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  Additionally, where a petitioner in an off-Table case is seeking to prove that a vaccination aggravated a preexisting injury, the petitioner must establish the three *Althen* prongs along with three additional factors described in the prior *Loving* case.  *See Loving ex rel. Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009) (combining the first three *Whitecotton* factors for claims regarding aggravation of a Table injury with the three *Althen* factors for off-Table injury claims to create a six-part test for off-Table aggravation claims); *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (applying the six-part *Loving* test).  The additional *Loving* factors require petitioners to demonstrate aggravation by showing: (1) the vaccinee's condition prior to the administration of the vaccine, (2) the vaccinee's current condition, and (3) whether the vaccinee's current condition constitutes a "significant aggravation" of the condition prior to the vaccination.  *Loving*, 86 Fed. Cl. at 144.

For both Table and non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence."  § 300aa-13(a).  That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence."  *Moberly*, 592 F.3d at 1322 n.2.  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award

10

based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded."  Vaccine Rule 3(b)(1).  Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing.  Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).

In determining entitlement to compensation, the special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1).  The special master is required to consider the entirety of the evidentiary record, draw plausible inferences, and articulate a rational basis for the decision.[6]  *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

### V.    Discussion

Contemporaneous medical records containing information supplied to or by treaters to facilitate the diagnosis and treatment of medical conditions are generally given significant weight as trustworthy evidence because, "[w]ith proper treatment hanging in the balance, accuracy has an extra premium."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  However, even while recognizing that a language barrier could potentially lead to some inconsistencies, "medical records

---

[6] A party may challenge a special master's decision before a judge of the U.S. Court of Federal Claims by filing a "motion for review."  Procedures and requirements for a motion for review are set forth in Vaccine Rules 23-28.  A motion for review must be accompanied by a memorandum of objections and must filed within 30 days of issuance of the decision to be reviewed.  No motions for extension of time are permitted.  *See* Vaccine Rule 36(b)(3) *and* Vaccine Rules 23(b).

are only as accurate as the person providing the information." *Parcells ex rel. Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).

Throughout the course of the medical history at issue, petitioner provided varied information to her treaters with regard to the onset and presentation of her chest pain. Petitioner initially reported on the date of vaccination, January 28, 2022, a 5-day history chest pain, which she attributed to a prior physical altercation. (Ex. 3, p. 1.) At another encounter on June 14, 2023, she reported a "sudden onset of chest pain" while sitting in her car on "June 13th." (Ex. 18, p. 4.) At yet another encounter on October 19, 2023, petitioner reported a history of "chest pressure for a year." (Ex. 24, p. 5.) Additionally, petitioner inconsistently described her symptomatology throughout her presentation. She sometimes associated her chest pain with shortness of breath, lightheadedness, dizziness, and/or weakness. She also sometimes described her chest pain as concerning her rib, as affecting her throat, as affecting her lung, as non-radiating, as radiating to her back, and as being associated with a blood clot that was "flowing around in her body." (Ex. 10, pp. 1; 5; Ex. 14, p. 4; Ex. 18, p. 4; Ex. 25, p. 12; Ex. 20, p. 21.) Moreover, petitioner presented on several occasions without complaints of chest pain. (*See* Ex. 15, pp. 7-8, 55; Ex. 25, pp. 18-31, 47-52; Ex. 21, pp. 6-12.)

Petitioner presented for medical evaluation of her chest symptoms on many occasions; however, petitioner's treaters were ultimately unable to determine an alternative diagnosis for her symptoms, which were initially attributed to blunt force trauma and a rib contusion. It was not until a year after her vaccination that petitioner reported a suspected causal role for her Tdap vaccination. Notably, petitioner refused to allow treaters to further investigate her symptoms on several occasions, resulting in incomplete medical records. (*See, e.g.*, Ex. 28, pp. 4-5; Ex. 24, p. 6; Ex. 25, p. 16.) Additionally, although petitioner continued to seek treatment for different issues, there was a significant gap in treatment of her chest-related issues between March of 2022 and June of 2023. This makes it more difficult to link her subsequent accounts of chest pain to her initial rib contusion. Moreover, petitioner herself at times suggested several alternative causal or aggravating factors for her symptoms, including a snake bite, blood clot, and pulmonary embolism. (Ex. 24, p. 5; Ex. 20, p. 21; Ex. 18, p. 4.) It was eventually suggested that petitioner's symptoms could be the result of anxiety. (*See, e.g.*, Ex. 20, p. 21; Ex. 25, p. 16.) In the petition, petitioner admits to experiencing health anxiety.[7] (ECF No. 1, pp. 5-6.)

---

[7] Petitioner explains that an "unhuman creature" had "deceived [her] with superstitions," causing "extreme[] anxiety." (ECF No. 1, p. 5.) In that regard, on February 3, 2022, petitioner reported to her primary care provider that "there is a creature in her body causing her to hear things." (Ex. 10, p. 1.) She reported, during a March 23, 2023 primary care encounter, that this "creature . . . told her that she may have a parasite infection." (Ex. 25, p. 25.)

In light of all of this, and based on my comprehensive review, petitioner's medical records do not preponderantly demonstrate a cognizable injury that could have been caused, or aggravated by, her Tdap vaccination.  "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Human Servs.*, 118 Fed. Cl. 47, 56 (2014) (emphasis omitted) (quoting § 300aa-11(c)), *aff'd per curiam*, 607 F. App'x 997 (Fed. Cir. 2015).  In order to present an "injury" cognizable under the Vaccine Act, "[m]edical recognition of the injury claimed is critical" and petitioner must assert "more than just a symptom or manifestation of an unknown injury."  *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010).  Here, the medical records do not suffice to document any defined and recognized injury.  Instead, they reflect pain initially attributable to a rib contusion followed by a number of other unexplained symptoms, none of which are immediately suspicious as being potentially vaccine related.  Additionally, the Vaccine Act itself forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  The burden is on the petitioner to initially introduce evidence demonstrating that the vaccination actually caused or aggravated the injury in question.  *Althen*, 418 F.3d at 1278; *Hines*, 940 F.2d at 1525.  Even assuming that some symptom or aspect of petitioner's presentation could potentially support a claim, petitioner's medical records do not include any medical opinion sufficient to support vaccine causation or significant aggravation of petitioner's condition.

While I understand that petitioner asserts that she experienced symptoms following her vaccination and that she holds a personal view that her symptoms are related to her vaccination, as a legal matter, a temporal association between vaccination and injury is not enough, standing alone, to demonstrate causation-in-fact under the standards of this program.  *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992) (noting that "a proximate temporal association alone does not suffice to show a causal link between vaccination and injury"); *Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1364-65 (Fed. Cir. 2012) (holding that the special master did not err in resolving the case pursuant to *Althen* prong two when respondent conceded that petitioner met *Althen* prong three).  Only a small subset of specific injuries designated on the Vaccine Injury Table get any kind of causal presumption based on temporal association.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1).  Petitioner has not alleged any of those injuries (nor do her medical records reflect such an injury).

In her show cause response, petitioner asserts that her condition can be explained by a vaccine-caused cytokine storm that aggravated her prior traumatic injury to her chest and ultimately resulted in chronic inflammation.  However, although petitioner has gone to great lengths seeking to substantiate this assertion with additional

testing and medical literature research, it is entirely unsupported by any medical records or medical opinion applying these concepts to her own clinical history. Indeed, petitioner acknowledges that there was no contemporaneous medical evaluation that could potentially support her assertion. (ECF No. 22, p. 33.) Nor do the articles filed by petitioner even establish that the vaccine at issue can cause cytokine storms. Numerous prior petitioners have tried, but failed, to implicate vaccines as a cause of a "cytokine storm." *See, e.g.*, *Bohn ex rel. G.B. v. Sec'y of Health & Human Servs.*, No. 16-0265V, 2021 WL 4302367, at *16-22 (Fed. Cl. Spec. Mstr. Aug. 23, 2021); *Whitesell ex rel. M.W. v. Sec'y of Health & Human Servs.*, No. 17-1557V, 2022 WL 3081327, at *5-6 (Fed. Cl. Spec. Mstr. July 17, 2022); *Rupert v. Sec'y of Health & Human Servs.*, No. 15-841V, 2021 WL 1832909, at *39-41 (Fed. Cl. Spec. Mstr. Apr. 31, 2021); *Martin ex rel. Martin v. Sec'y of Health & Human Servs.*, No. 17-250V, 2020 WL 4815840, at *27 (Fed. Cl. Spec. Mstr. July 17, 2020); *Martin v. Sec'y of Health & Human Servs.*, No. 15-789V, 2020 WL 4197748, at *28 n.37 (Fed. Cl. Spec. Mstr. May 8, 2020), *mot. for rev. denied*, 158 Fed. Cl. 459 (2020); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *7-18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Bigbee v. Sec'y of Health & Human Servs.*, No. 06-663V, 2012 WL 1237759, at *32-36 (Fed. Cl. Spec. Mstr. Mar. 22, 2012).

Even acknowledging that a vaccine will induce some inflammatory immune response, mere invocation of a vaccine's intended immune response is not in and of itself sufficient to carry petitioner's burden under *Althen* prong one. *See Elvira ex rel. D.E. v. Sec'y of Health & Human Servs.*, No. 17-531V, 2024 WL 4966035, at *20 (Fed. Cl. Spec. Mstr. Nov. 6, 2024); *Vanore v. Sec'y of Health & Human Servs.*, No. 21-0870V, 2024 WL 3200287, at *18 (Fed. Cl. Spec. Mstr. May 31, 2024); *Kalajdzic ex rel. A.K. v. Sec'y of Health & Human Servs.*, No. 17-792V, 2022 WL 2678877, at *23 (Fed. Cl. Spec. Mstr. June 17, 2022), *mot. for rev. denied*, No. 17-792V, 2024 WL 4524777 (Fed. Cl. Oct. 18, 2024), *aff'd*, No. 2023-1321, 2024 WL 3064398 (Fed. Cir. June 20, 2024); *Cordova v. Sec'y of Health & Human Servs.*, No. 17-1282V, 2021 WL 3285367, at *17 (Fed. Cl. Spec. Mstr. June 23, 2021). There must be some additional evidence linking the vaccine's immune response to the pathology of petitioner's actual condition. For example, the Chief Special Master has observed:

> I have on many occasions considered theories asserting a vaccine-caused, cytokine-driven process led to injury, but have repeatedly deemed such theories wanting, absent evidence connecting the process (no matter how scientifically plausible it might be) with additional proof sufficient to render it "more likely than not" that the immune processes outlined could be rendered pathogenic by introduction of a vaccine. Otherwise, such a theory only attempts to transmute the expected reaction to a vaccine into pathology.

*M.R. v. Sec'y of Health & Human Servs.*, No. 16-1024V, 2023 WL 4936727, at *27 (Fed. Cl. Spec. Mstr. June 30, 2023) (citing *Dean ex rel. I.D. v. Sec'y of Health & Human*

*Servs.*, No. 13-808V, 2017 WL 2926605, at *17 (Fed. Cl. Spec. Mstr. June 9, 2017)); *see also Kaltenmark v. Sec'y of Health & Human Servs.*, No.17-1362V, 2023 WL 8870299, at *28 (Fed. Cl. Spec. Mstr. Nov. 27, 2023) (the undersigned observing that, "[e]ven where there is some reason to suspect a condition may be cytokine mediated, this does not automatically lead to the conclusion that vaccine can cause the injury merely because vaccines produce some cytokine elevations").

Finally, I note that resolution of this case on the existing record and at this juncture is appropriate.  Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing.  Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d).  In this case, petitioner filed sufficient medical records for respondent to conduct his medical review.  However, after completing that review, he recommended against compensation, stressing in particular that petitioner had not demonstrated a cognizable injury.  Thereafter, I provided petitioner clear notice of her burden of proof in my subsequent order to show cause and permitted petitioner a five-month period within which to respond.  In her response, petitioner failed to cure the deficiencies in her claim while also effectively confirming that no medical opinion would be forthcoming, given that her medical records include no such opinion and she indicated she was unable to secure an expert opinion.  Accordingly, dismissal is appropriate at this time.

## VI.    Conclusion

Petitioner has my sympathy for what she has endured over many years, regardless of the cause.  However, for the reasons discussed above, petitioner is not entitled to compensation and this case is now **DISMISSED**.  The clerk of the court is directed to enter judgment in accordance with this decision.[8]

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.